Exhibit D



BRASSICA
PROTECTION PRODUCTS LLC

March 23, 2007

**Via Federal Express**

Caudill Seed Co., Inc.
1402 W. Main Street
Louisville, Kentucky 40203
Attention: Mr. Dan Caudill

Dear Dan:

I am writing in connection with the Sublicense, Manufacture and Distribution Agreement (the "Agreement") between Brassica Protection Products LLC ("BPP") and Caudill Seed and Warehouse Co. ("CSC") dated as of December 6, 2004. Unless otherwise specified, capitalized terms in this letter have the same meanings as set forth in the Agreement.

In accordance with sections 3.6 (Inspection) and 6.4 (Audit) of the Agreement, beginning April 9, 2007, BPP will inspect and audit CSC in Louisville, including but not limited to all Laboratories and Records. Without limiting the scope of the inspection and audit, we thought it would be helpful to specify in advance some of the Records and materials that our inspection team (two persons) will want to review in order to expedite the process. Please have the following available for the inspection and audit in Louisville:

cGMP Documentation. Our expert on food and dietary supplement regulations, including GMP, has completed his review of the documents you sent to us in mid-November. You stated at the time that all the process documents had been reviewed by a third party auditor and that your GMPs "meet or exceed the requirements" of proposed 21 CFR Parts 111 and 112. According to the report from our expert, however, the documentation does not meet either the requirements of those provisions or the specifications for the production of the Product set forth in Exhibit B to the Agreement. For your convenience, I have enclosed a copy of the expert report (without exhibits). Please have available for inspection any documents that are described in detail on pages 3 and 4 of his report, together with all Laboratory records and testing data.

As we understand it, you have produced samples and /or small quantities of a new Product, "SGS™-200" and you plan to manufacture this new Product for distribution and sale pursuant to the Agreement. Please have ready for inspection and review all of the cGMP documentation in connection with (i) the production of this SGS-200 sample / small quantity and (ii) any existing or planned production of SGS-200. This should include the documentation described on pages 3 and 4 of the enclosed expert report, and all Laboratory records and testing data.

Product Samples. Our auditors will collect samples of any and all lots of SGS-100, SGS - 200, and any other lot or batch of Product (including Ingredient Product and Finished

Caudill Seed Co., Inc.
March 23, 2007
Page 2

Product) that you have manufactured or intend to sell or distribute, in accordance with section 3.7 of the Agreement.

Labels. Please provide samples of all labels that have been used for the Product, together with any labels that you plan to use for future Products, including Labeling and Packaging used or planned to be used for Finished Products, Ingredient Products, and including Labeling and Packaging for Products sold or planned to be sold or distributed by CSC, by third parties, or for Products sold or to be sold to end users.

To the extent that any of the documentation, samples, and labels described above or in the enclosed report do not exist, please let us know as soon as possible so that our auditing team can plan accordingly.

If you have any questions regarding the inspection and audit, please let me know. Thank you for your cooperation and assistance.

Sincerely,

Tony Talalay

Enc.

cc: Patrick J. Welsh (w/ encl.) (via Federal Express)


P.S. Dan, I just received your March 20, 2007 letter suggesting that we "unwind" the Agreement. I will send you a response under separate cover within the next several days. This has no effect on the audit and inspection beginning April 9th.

 *Specializing in FDA Regulatory Matters*

CONFIDENTIAL:
ATTORNEY CLIENT PRIVILEGE .

DOCUMENT REVIEW

**Date:** March 16, 2007

**Firm:** Assessment of Good Manufacturing Practices Followed by
Caudill Seed Co., Inc. in the Production of "SGS" Dietary Supplements

**Reviewer:** Carl C. Reynolds, Vice President

---

**ASSESSMENT:** This review was done at the request of Brassica Protection Products LLC ("BPP"), Baltimore, MD 21224 and consisted of reviewing various documents associated with the extraction and processing of Sulforaphane Glucosinolate (SGS-100) from broccoli seeds by Caudill Seed Co., Inc., Louisville, KY ( "CSC" or "Caudill"). An itemized list of the documents furnished to me to review is attached to this report. I understand that the documents were provided to BPP by CSC in response to a request from BPP for records documenting CSC's adherence to current good manufacturing practices ("cGMP") in the production of SGS containing dietary supplements.

I am Vice President of EAS Consulting Group, LLC, Alexandria, VA 22314 (EAS) and in this capacity I conduct audits and provide regulatory consultation with compliance assistance to industries regulated by the U.S. Food and Drug Administration (FDA). I retired from the FDA in January 1999 after more than 36 years of service as an investigator, middle manager, and member of the Senior Executive Service. My last assignment at the FDA was that of Director, Office of Field Programs, Center for Food Safety and Applied Nutrition, Washington, DC.

My duties at EAS include conducting comprehensive audits of food manufacturing and warehousing facilities, dietary supplement and dietary ingredient manufacturers and finished dose and bulk pharmaceutical manufacturers. I am an approved auditor by the Natural Products Association (NPA) for conducting audits of dietary supplement manufacturers under the NPA GMP Certification Program for Dietary Supplements. I have conducted approximately 93 audits of 66 nutritional supplement firms in the United States, Canada, Mexico and Italy under the NPA Certification Program for Dietary Supplements; the USP certification program for nutritional supplements, and for compliance against the provisions of proposed 21 CFR Parts 111 and 112, Current Good Manufacturing Practice in Manufacturing, Packing, or Holding Dietary Ingredients and Dietary Supplements.

EAS Consulting Group, LLC
1940 Duke Street, Suite 200, Alexandria, Virginia 22314
(877) 327-9808 Toll Free • (703) 684-4408 Local • (703) 684-4428 Fax

www.easconsultinggroup.com

Document Review, Caudill Seed Co., Inc.
March 16, 2007
Page 2

I serve as an instructor during EAC sponsored training programs on good manufacturing practices for dietary supplements and dietary ingredients and the NPA program, "Preparing for Certification." I have been a frequent speaker at meetings, professional conferences and web-based training/information programs regarding implementation of good manufacturing practices in the dietary supplement industry, product recalls, and the inspectional programs and regulatory authority of the FDA.

A copy of my *curriculum vitae* is attached to this report.

The information provided appears to have been developed or compiled by Caudill in an attempt to document how the SGS-100 was extracted, processed and packaged at what appears to be different locations reportedly in accordance with the provisions of proposed 21 CFR Parts 111 and 112, Current Good Manufacturing Practice in Manufacturing, Packing, or Holding Dietary Ingredients and Dietary Supplements (68 Fed. Reg. 12158 (March 13, 2003)). I am informed that in delivering these documents to Brassica, CSC stated that "these GMP's meet or exceed" the foregoing regulatory provisions. The documents also purport to show that the various stages in manufacturing are done in compliance with Good Agricultural Practices, ISO/HACCP or drug cGMPS at 21 CFR Parts 200 to 299.

There was no documentation provided to verify that a hazard analysis has been conducted and that a HACCP plan has been implemented. Included in the documentation was an FDA declaration dated in 2004 that Opti-Med Controlled Release Labs, Inc., Seymour, IN was subject to periodic FDA inspections and that the latest, undated inspection found the firm in substantial compliance with cGMP regulations. Opti-Med was registered with FDA at least in 2004 under the provisions of Section 510 of the Food, Drug, and Cosmetic Act ("the FDC Act"), but current status was not provided by CSC. Nor did CSC provide any information to document whether any of the food processing facilities mentioned are registered with FDA under the Bioterrorism Act.

Documentation reviewed included analytical data, production history, process control points and sampling frequency, inspection sheets, batch records, labeling, and a Certificate of Conformance. Although there was no evidence that the material covered by the records did not conform to product physical, chemical or microbiological specifications, there was inadequate information available to determine if past or future manufacturing of SGS-100 will be done in compliance with good manufacturing practices for dietary supplements as proposed at 21 CFR Parts 111 and 112 or in conformance with the "Exhibit B Specifications for the product that were furnished to me. In the absence of such documentation, which is required by these provisions, it is clear that the expectations of BPP and the proposed regulations are not being met by CSC. No information or evidence of compliance was provided regarding the following fundamental elements of a compliant system for dietary supplements:

Document Review, Caudill Seed Co., Inc.
March 16, 2007
Page 3

1.  Policies and procedures (SOPs) as outlined in the proposed regulation to ensure consistency and to prevent adulteration (an SOP should exist for operating or controlling each piece of equipment, system or process that must be cleaned, maintained, calibrated or otherwise affects the quality, composition or purity of the finished product).

2.  A change control program to ensure permanent changes or modifications to procedures or documentation to address regulatory changes or improvement or modifications in or with procedures or facilities are properly approved and documented.

3.  Identity testing of dietary ingredients.

4.  Documented quarantine, testing and release procedures to ensure all components, raw materials and finished product conform to specifications.

5.  A master batch record with corresponding batch record that accurately follows the master batch record (these master and batch records must contain certain prescribed information as outlined in the proposed regulations).

6.  Established specifications for every point, step or stage in the manufacturing process where control is necessary to prevent adulteration (these control points, steps, or stages must be monitored to ensure that specifications are met and corrective action plans are in place when such specifications are not met).

7.  The existence of a functioning quality unit with defined authority and responsibility.

8.  Policies and procedures for handling planned and unplanned processing deviations as well as investigating out-of-specification analytical results.

9.  Documentation confirming that personnel are trained and qualified.

10. A physical facility that is clean and properly maintained to prevent adulteration of product(s).

11. No documentation was provided that the manufacturing process has been validated to meet BPP specifications.

12. Equipment and utensils that are of appropriate design, construction and workmanship and can be adequately cleaned and properly maintained.

13. A documented calibration program.

Document Review, Caudill Seed Co., Inc.
March 16, 2007
Page 4

14. Testing of each finished batch to determine conformance to specifications for identity, purity, quality, strength and composition.

15. Documented and validated testing methods **are** used when testing to ensure each established specification is met.

16. A sample retention program.

17. A record retention program.

18. A control program for the issuance and use of packaging and labels with reconciliation.

19. A written testing program to assess stability characteristics, and use stability results to establish storage conditions and expiration dating (while expiration dating is not required in the proposed rule, if expiration dating is used, the manufacturer should have data to support that date. It should also be mentioned that FDA has determined that the compliance requirements of NLEA at 21 CFR 101.9(g) for conventional foods are generally applicable to dietary supplements (no documentation on this parameter was provided)).

20. Electronic records in compliance with the requirements of 21 CFR Part 11, Electronic Records; Electronic Signatures.

The cornerstone of cGMP compliance centers on sound documentation and record keeping practices. FDA officials determine cGMP compliance by inspections and record review. Records, therefore, are absolutely necessary to demonstrate compliance with cGMP regulations. Once FDA's proposed dietary supplement cGMP regulations are finalized and in effect, FDA would consider the failure to have a required record to amount to a violation of Section 402(g) of the FDC Act. Moreover, such a failure, even in the absence of effective cGMP regulations for dietary supplements, could also constitute a violation of section 402(a)(4) of the FDC Act. Thus, if FDA were asked to review the documents provided by CSC and evaluate whether the documents substantiate cGMP for dietary supplements, the agency could only, in light of the omissions noted above, conclude -- as I do -- that the documents do not establish cGMP. Moreover, if, in fact, CSC believed these documents establish cGMP, the company's comprehension of what adherence to cGMP entails is seriously flawed.

Carl C Reynolds
Vice President

Exhibit E



*Specializing in FDA Regulatory Matters*

AUDIT REPORT

**Date:**              May 31, 2007

**Location:**         Caudill Seed Co., Inc.
                       1402 West Main St.
                       Louisville, KY 40203

                       And

                       1531 West Main St.
                       Louisville, KY 40203

**Audit Dates:**      April 25 – 27, 2007

**Auditor:**            Carl C. Reynolds, Senior Consultant

**ASSESSMENT:** This 3rd party audit was conducted at the request of Brassica Protection Products, LLC, (BPP) Baltimore, MD 21224 to evaluate the records and procedures used by and on behalf of Caudill Seed Co., Inc. (Caudill) in manufacturing Sulforaphane Glucosinolate (SGS), a derivative of broccoli seeds, for use as a dietary supplement or dietary ingredient. Previous document review (Reynolds Memorandum dated March 26, 2007) disclosed that information provided by Caudill did not support a claim that the SGS produced complied with the regulatory provisions of proposed 21 CFR Parts 111 and 112, Current Good Manufacturing Practice in Manufacturing, Packing, or Holding Dietary Ingredients and Dietary Supplements (68 Fed. Reg. 12158 dated March 13, 2003), and the product specifications previously furnished to me by BPP (Exhibit B, "Specifications for the product," hereinafter referred to as "Product Specifications"), copy attached.

Information and records reviewed during the audit were provided by Dan Caudill, President; Kean Ashurst, and other managerial and staff personnel. At Caudill's request, Perry Bratton, PhD, Food Protection Services, LLC, participated in the first day of the audit. Dr. Bratton was introduced as a Caudill consultant, but he had no significant role in the audit discussions I had with Caudill management and staff. Moreover, when I discussed proposed regulatory requirements for dietary supplements and dietary ingredients, Dr. Bratton made no effort to engage or comment. Furthermore, based on the comments of Messrs. Caudill and Ashurst during these discussions, I question whether they are fully aware of cGMP requirements.

On April 27, 2007, Mr. Ashurst; Del Thacker, Chief Operations Officer, Health Foods/Natural Products Division and I visited JLM Pharmatech, Inc., ("JLM") 2223 Killion Ave., Seymour, IN and interviewed Jerome (Jerry) Mincy, President. JLM blends the SGS before packing in the bulk for further processing or encapsulating for consumer sales.

EAS Consulting Group, LLC
1940 Duke Street, Suite 200, Alexandria, Virginia 22314
(877) 327-9808 Toll Free • (703) 684-4408 Local • (703) 684-4428 Fax



**OPERATIONS:** Caudill Seed Co., Inc. operates primarily as a distributor of various varieties of seeds and equipment to the sprouting industry. The company is not a manufacturing facility for extracting SGS from broccoli seeds, but it does contract with other firms to grow broccoli seeds and then process, extract and package SGS for commercial distribution.

From the information Caudill provided, there have been two (2) manufacturing runs for SGS. The first was more of a pilot operation using Texas A & M, College Station, TX and an unidentified firm in Minnesota (the resulting product, however, was marketed). No records at all were provided for either of these manufacturing runs. The second run utilized broccoli seeds grown in California under contract with Caudill. According to Mr. Caudill, broccoli seeds for use in SGS production were tested in California for germination, purity (percent of pure seed of interest) and Glucoraphanin level. Broccoli seeds are packed in totes or 50-55 lb. bags and shipped to Louisville where reportedly every container is probed and retested for Salmonella, E. coli 0157-H7, Listeria monocytogenes, germination, purity and Glucoraphanin level before being shipped to Wenger Extrusion Food Pilot Lab, Sabetha, KS for manufacturing into collets. Collets are shipped to Nateco2 GmbH & Co. KG, Auenstrabe 18-20, D-85283 Wolnzach, Germany for super critical extraction. Resulting processed SGS material is packed in super sacks of 250 kg capacity and shipped to JLM Pharmatech, Inc., Seymour, IN where it is blended and packaged in the bulk or in capsules for consumer use. There were no records provided for my review regarding these production runs or analytical testing.

There is no "manufacturing" of SGS in the traditional sense at the Caudill facility. However, at the time of this audit the firm was warehousing SGS packed for bulk distribution as well as encapsulated SGS (Vitalica) product in a dedicated, locked approximate 20 ft. x 20 ft. refrigerated room located on the second floor within a building located at 1531 West Main St. Louisville, KY 40203. Temperature and humidity in the room are monitored daily and the corresponding data are documented. The firm also recently installed a chart recorder for temperature and humidity monitoring on a "24/7" basis. Inspection of the storage room disclosed the room to be clean with product in storage packed in cardboard cartons and stored on metal racking. The room was being maintained at $62.3^{\circ}$ F and 60% relative humidity. Records of temperature/humidity monitoring were reviewed and data were consistent with the readings I observed.

The Caudill facility at 1402 West Main Street has been registered with FDA under the Bioterrorism Act and has been assigned number 11875657960. The building housing the refrigerated storage room has also been registered and has been assigned number 16784833098.

**OBSERVATIONS:** From information reviewed in advance of this audit, Caudill expressly represented to BPP that it would manufacture and distribute SGS under the provisions of proposed 21 CFR Parts 111 and 112, Current Good Manufacturing Practice in Manufacturing, Packing, or Holding Dietary Ingredients and Dietary Supplements published on March 13, 2003. However, during a discussion regarding the provisions of proposed 21 CFR Parts 111 and 112 and their applicability to the SGS in Caudill's possession, Mr. Ashurst disagreed and advised that the regulatory standard he has used for the second production run of SGS was that published by FDA in 1997. Upon further discussion, it became evident that Mr. Ashurst was speaking of the advance notice of proposed rulemaking (ANPR) that FDA published on February 6, 1997 (62 FR



5700).[1] Mr. Ashurst printed a second copy of "Caudill Seed Co., Inc. Manufacturing Technique of SGS-100 Produced From Broccoli Seeds" dated September 19, 2006 that was resident on his computer and this copy also had reference that all product will be processed, stored, and shipped in accordance with 21 CFR Parts 111 and 112, Current Good Manufacturing Practice in Manufacturing, Packing, or Holding Dietary Ingredients and Dietary Supplements: Proposed Rule Date: March 13, 2003. I mentioned the reference to the 2003 proposed regulation was the same in both documents to which Mr. Ashurst made no comment. Mr. Caudill did not make any comment or reply to Mr. Ashurst's position.

Even though Caudill at its facility does not extract, package, label or perform "manufacturing" activities related to SGS, the company is, nevertheless, as a requirement of good manufacturing practice, responsible for ensuring that its contractor(s) complies with all applicable cGMP regulations. The responsibility pertains to both domestic and foreign firms.[2] Mr. Caudill seemed surprised at this information, but made no comments regarding its significance. In any event, no information or documentation was on hand with respect to cGMP compliance at the other facilities.

The Caudill Louisville facility has a documented quality policy with attendant standard operating procedures (SOP). On November 17, 2006 the facility was inspected by the Steritech Group, Inc., Charlotte, NC and found to be "in substantial compliance" with Good Manufacturing Practices. While the regulatory standard was not mentioned, it appears to have been 21 CFR Part 110, Current Good Manufacturing Practice in Manufacturing, Packing or Holding Human Food. Caudill also received a Superior rating and Certificate of Achievement from AIB based on an inspection dated August 18, 2006 in which the facility was found to have "fulfilled the requirements of the AIB Consolidated Standard for Food Distribution Centers."

I mentioned to Mr. Ashurst that I had been informed that BPP had been advised that a 3rd party expert had evaluated Caudill's operations for compliance with dietary supplement regulations. He stated that they were referring to the AIB and Steritech findings of compliance. I also understood him to state that Wenger Extrusion Food Pilot Lab, Sabetha, KS had been inspected by AIB and found in compliance with the Food GMPs. He added that the German firm was ISO Certified and provided a copy of a certificate from The Certification Body of TUV SUD Management Service GmbH stating that Nateco2 GmbH & Co. KG had established and applies an Environmental Management System and fulfilled the requirements according to ISO 14001:2004.

---

[1] In this advance notice, the agency published an industry authored set of cGMP criteria and requested comment on the "framework" the industry submission presented; the agency's 2003 proposal embodies the procedures FDA developed.
[2] The proposed regulations would not pertain to activities related to the harvesting, storage, or distribution of raw agricultural commodities (broccoli seeds) that will be incorporated into a dietary ingredient or dietary supplement. The term "raw agricultural commodity" is defined in the Federal Food, Drug, and Cosmetic Act as any food in its raw or natural state including all fruits that are washed, colored, or otherwise treated in their unpeeled natural form prior to marketing.



Although all documentation with respect to cGMP compliance in the production of supplements had been requested and be available for inspection, only the following guidance and policy documents were provided for my review:

1. Caudill Seed Quality Policy
2. Latest AIB ratings as mentioned earlier

3. Organizational Chart

   In reviewing the organizational chart, I was informed that Dana Dansbury was now assigned to QA/Sanitation activities. I did not review the position description, but I was told this position was not involved in SGS activities save for sanitarian activities in general. As a result, there is no fully, functioning Quality Unit as required in the proposed regulations for dietary supplements nor does it appear that Quality duties and responsibilities have been assigned as required for the production of SGS supplements. My impression is that Mr. Ashurst is the prime individual in SGS activities and I understood him to say that he has been in attendance at Caudill's 3rd party firms when they have been involved in SGS manufacturing and packaging activities. Based on information provided, there seems to have been no involvement of the quality control unit in evaluating or determining compliance by the 3rd party manufacturing facilities in the proposed regulations for dietary supplements and dietary ingredients.[3]

4. Regulatory Inspection Policy
5. HACCP program for blending and packaging beans, seeds, grain for non-thermal processing
6. Recall and Product Withdrawal Policy

   Program requires mock recalls twice a year with target efficiency of 98 – 102% located within 2 hours. If mock recalls are outside of target specifications, another mock recall is to be conducted within 60 days. The last mock recall was done on August 11, 2006 of bulger wheat. No evidence of mock recalls of SGS was provided.

7. GMPs and Team Member Training
8. Self Inspection and Reporting Policy

   An audit of the Quality System must be done at least annually with the most recent internal food safety audit conducted on March 30, 2007.

9. Master Sanitation Schedule
10. Receiving/Carrier (Shipping) Policy
11. Non-conforming Materials Programs
12. Glass and Hard Plastics Policy

---

[3]The proposed regulations and the Product Specifications, more generally, require that a quality control unit be used to ensure that manufacturing, packaging, label, and holding operation in the production of dietary ingredients and dietary supplements are performed in a manner that prevents adulteration and misbranding, including ensuring that dietary ingredients and dietary supplements meet specifications for identity, purity, quality, strength, and composition.



  13. Pest Control
  14. Preventive Maintenance Logs
  15. Supplier Approval Policy
  16. Consumer Complaint Policy
  17. Food Security Program
  18. Visitor and Contractors GMPs
  19. Allergen Control Policy

If a comment was not made regarding a particular policy or procedure, it was not because they were complete or compliant with a cGMP environment. It was because they did not impact on the issue(s) associated with this audit.

I requested stability protocols and data to support their assigned expiration dating and Mr. Ashurst provided a copy of SOP Procedure #2 dated February 18, 2006 along with copies of analytical data. The procedure was written and approved by Mr. Ashurst without any apparent involvement of other individuals. The purpose of the procedure was to "implement and assess the stability characteristics of products and to determine appropriate storage conditions and expiration dates of Vitalica Capsules and SGS-100 Bulk Powder." There was no individual stability study protocols provided.

The program requires that samples be packaged under vacuum with storage at 60 - 80° F and humidity at 50 – 75%. While recognizing that there are no FDA guidelines for stability studies on dietary supplements, dietary ingredients or foods in general, these parameters deviate from the FDA ICH guidelines for new drug substances and products. FDA ICH guidelines call for long term testing at 25° C ± 2° C/60% RH ± 5% and accelerated testing at 40° C ± 2° C/75% RH ± 5%. Also, the containers to be used in long term, real time stability evaluation should be the same as or simulate the actual packaging used for storage and distribution.

Review of the data provided by Mr. Ashurst showed testing was done by Microbac Laboratories, Inc., Louisville, KY and included parameters for Glucorapharin levels, aerobic plate count, yeast and mold, Salmonella, Listeria monocytogenes, E. coli MPN, E. coli 0157:H7, moisture and pH. No pathogens were detected and Glucoraphanin levels ranged between 125 and 95 UMOL/G. Copies of the stability SOP and analytical data are attached to this report.

The only documentation that was available regarding the GMP status of the manufacturing facilities was that previously provided and reviewed and evaluated in my March 26, 2007 report. The firm did not have copies of GMP policies and procedures. The firm did not have an index of said documentation for review. Caudill was not able to demonstrate that SGS has been made in compliance with cGMP and was not able to provide any assurance that the Company or its manufacturing partners were prepared or in a position to follow the 2003 proposed dietary supplement cGMPs.

The visit to JLM disclosed the firm has equipment and capability for product development, tableting, encapsulation, pouching of tablets, capsules, and powders, dry product bottling, tablet coating, and blister packaging. The firm is registered with FDA as a drug manufacturer under Sec. 510 of the FDC Act, but they also perform aforementioned activities for nutritional products. A brief tour of the facilities confirmed equipment and apparent capability for conducting the operations stated. An index of procedural documents was provided and subsequent review showed substantial compliance with most cGMP activities as outlined in the proposed regulations



for dietary supplements and dietary ingredients. Issues arising under the proposed regulations and the Product Specifications that did not appear to be addressed in JLM procedures are related to (1) establishing a specification for any point, step or stage in the manufacturing process where control is necessary to prevent adulteration and (2) including this information in the master batch record and subsequently in the batch record. And, obviously, to this end JLM would also have to be able to document that it monitors each point, step or stage for which a specification is established and that it ensures--through testing or examination-- that each specification is met and documented. This requirement was specifically discussed with Mr. Mincy during the visit. Mr. Mincy stated that if changes were necessary in documentation, they would be accomplished following the firm's documented change control program.

In spite of all the foregoing information, the documentation gaps and omissions mentioned in my March 26, 2007 report remain substantially unaddressed.

With specific reference to the Product Specifications, the necessary documentation was not presented to me. For example, there were no manufacturing procedures that appear to have been approved by BPP, no documents or SOPs indicating the oversight and approval responsibilities of a quality control unit, no written master manufacturing directions, no validated production process of at least three lots of actual production, no completed manufacturing batch records, and no certificates or other records of quality control responsibilities for laboratory controls and batch release testing.

During the wrap up session with Messrs. Caudill and Ashurst, Mr. Caudill appeared aware that the company did not have documentation, information, or data to support a conclusion that the SGS was manufactured under the proposed dietary supplement and dietary ingredient regulations. He, nevertheless, requested Mr. Ashurst to obtain at least an index of SOP documentation from the Kansas and German firms. He also seemed to indicate a willingness to use outside expertise to develop the necessary policies and procedures to comply with cGMP requirements.

**CONCLUSIONS:** Based on the data available and absent a visit to the other manufacturing facilities, I have no basis to conclude that the SGS at issue was manufactured according to cGMP requirements. Clearly, the company could not provide documentation establishing (1) that it is compliance with the 2003 proposed dietary supplement cGMPs, (2) that the company has even made an effort to achieve such compliance, or (3) that the company understood what policies and practices were necessary to achieve compliance with cGMPs or the 2003 proposed cGMPs. In fact, in light of Mr. Ashurst's comments with respect to the 1997 "advance notice" cGMPs, it seemed clear that procedures designed to be fully compliant with the 2003 proposal are not now and have never been in place anywhere along the current manufacturing chain. Similarly, it is equally clear that SGS is not manufactured in accordance with the Product Specifications.

There is significantly more to GMP compliance than a batch record and data to show that a product conforms to chemical, physical or microbiological specifications. Documented policies and procedures and supporting records are the cornerstone of cGMP compliance. An SOP should exist for operating or controlling each piece of equipment, system or process that must be



cleaned, maintained, calibrated, or otherwise affects the finished product. Documentation and records must be complete, understandable and demonstrate that a firm's policies and procedures were followed to ensure a product meets its purported identity, composition, strength, quality and purity. With the possible exception of JLM, information was not provided that allows me to conclude that the manufacturing steps performed by Wenger Extrusion Food Pilot Lab. and Nateco2 GmbH & Co. were done in compliance with the provisions of proposed 21 CFR Parts 111 and 112.

Carl C. Reynolds
Senior Consultant

Exhibit F



**BRASSICA**
PROTECTION PRODUCTS LLC

June 8, 2007

***VIA FEDERAL EXPRESS***

Caudill Seed Co., Inc.
1402 W. Main Street
Louisville, Kentucky 40203
Attention: Mr. Dan Caudill

Dear Dan:

I am writing in accordance with the Sublicense, Manufacture, and Distribution Agreement (the "Agreement"), dated as of December 6, 2004, between Brassica Protection Products LLC ("BPP") and Caudill Seed & Warehouse Co., Inc., d/b/a Caudill Seed Co. ("CSC"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

**Notice of Termination.** Pursuant to section 10.2(a) of the Agreement, BPP hereby terminates the Agreement for the Events of Default described below. The termination of the Agreement will be effective on July 12, 2007, or such earlier date as the parties may hereafter agree (the "Effective Date"). Notwithstanding the foregoing, the termination will not be effective if within 30 days from this notice CSC cures the Events of Default to the reasonable satisfaction of BPP, as provided in section 10.2(a)(i)(B).

In accordance with section 10.4(a) of the Agreement, upon the Effective Date all rights granted to CSC shall revert to BPP and CSC shall cease the production, manufacture, distribution, sale, use or advertisement of the Product.

**Events of Default.** The following material breaches constitute Events of Default pursuant to sections 10.3(e) and 10.3(f) of the Agreement:

*Quality Control*

CSC is not manufacturing the Product in accordance with sections 3.1 (Manufacturing Standards), 3.2 (Manufacturing Facility), and 3.8 (Product Specifications Amendments) of the Agreement. CSC's numerous deficiencies are described in Carl Reynolds' May 31, 2007 report of the recent audit of the CSC facilities (the "Audit"), which is enclosed.

In contravention of section 6.2 (Manufacturing Records), CSC does not maintain in a form readily available and comprehendible by BPP all Records relating to the production, manufacture, packaging, labeling, storage, shipment, supplying and disposition of each Product batch. In this regard, and despite its prior written and verbal assurances, CSC has not provided BPP with complete Product manufacturing batch records, which are fundamental to compliance with Good Manufacturing Practices.

Caudill Seed Co., Inc.
June 8, 2007
Page 2

CSC and its customers have repeatedly failed to label and package all Product with
Labeling and Packaging approved in advance and in writing by BPP, as required by section 3.4
of the Agreement. These failures include, but may not be limited to, Labeling and Packaging for
BroccoLiv from LA Naturals, Vitamin Shoppe Advanced Longevity Formula, and Quest SGS.

CSC has not obtained BPP's express written advance approval of health claims (section
3.4 and 4.3(b)); CSC has not obtained BPP's express written advance approval of advertising
(section 4.3(a)); CSC (including its customers) has used Labels and Packaging that do not
include the applicable patent numbers (section 1.21).

To our knowledge, CSC has not obtained from purchasers of unlabeled Finished Product
and purchasers of Ingredient Product their agreements to comply with certain provisions of the
Agreement (section 2.1).

CSC has failed to provide BPP with samples of each lot or batch of Product
manufactured and shipped under the Agreement (section 3.7).

### *Other Material Breaches*

No annual Marketing Plan as required by section 4.5 of the Agreement has been
submitted by CSC. More specifically, CSC has not submitted a plan that addresses or delineates
CSC's marketing strategy and positioning to customers and consumers, planned advertising,
marketing and promotional activities, including promotion at trade events, and including market
research, sales and distribution audits.

CSC does not appear to maintain files of all customer communications (section 8.3).

CSC has not furnished BPP with certificates of insurance evidencing coverage of BPP as
an additional insured (section 12.4).

With reference to the August 23, 2006 letter regarding certain material rights and
obligations of the parties under the Agreement (copy enclosed), CSC has breached its obligations
to:

- deliver to BPP written standard operating procedures ("SOPs") for the irradiation
  and handling of all then-existing Product;

- furnish to BPP a comprehendible and complete inventory of all then-existing
  Product, including the sale or disposition of such Product, the location thereof and
  whether such Product has been irradiated;

- make no sales of then-existing Product unless irradiated;

- deliver to BPP a letter from a recognized expert stating that the Product can
  legally be sold if irradiated and that the irradiated Product has been Labeled in
  accordance with FDA rules and regulations;

Caudill Seed Co., Inc.
June 8, 2007
Page 3

⊙    receive prior written approval of Johns Hopkins and BPP for the use by CSC or
      its customers of the Johns Hopkins name in Labeling and marketing material.

Most of the foregoing breaches and failures have been the subject of previous efforts by BPP to
obtain CSC compliance. In large part, these efforts have been ignored, resisted, or not
adequately addressed by CSC. For example, CSC has represented to BPP that it meets or
exceeds all appropriate standards for its Product including, specifically, the proposed 21 CFR
111 and 112, Current Good Manufacturing Practice in Manufacturing, Packing or Holding
Dietary Ingredients and Dietary Supplements published March 13, 2003, yet the Audit
demonstrates CSC's failure to do so.

If additional Events of Default by CSC come to BPP's attention, BPP reserves the right and
option to supplement this notice.

    **Post-termination.** On or prior to the Effective Date, please (a) prepare and furnish to us
a correct and understandable Inventory, as provided in section 10.4(b) of the Agreement, and we
will notify you with respect to the possible exercise of our purchase option, and (b) return all of
BPP's Confidential Information, as required by section 10.4(d) of the Agreement. For your
convenience, you may return the Confidential Information to our counsel in Louisville, whose
contact information is set forth below.

                John L. Tate, Esq.
                Stites & Harbison PLLC
                400 West Market Street, Suite 1800
                Louisville, KY 40202
                (502) 681-0460

BPP will return CSC information marked "confidential" in accordance with the Agreement.

    Prior to the Effective Date, BPP will forward CSC a license for CSC to execute regarding
the use of CSC patents and Know-How, in accordance with section 10.7 of the Agreement.

                Sincerely,

                BRASSICA PROTECTION PRODUCTS LLC

                By: _____
                    Antony Talalay
                    CEO

**VIA FEDEX**
cc:    Patrick J. Welsh, Esq.
        Floyd I. Wittlin, Esq.
        John L. Tate, Esq.

BRASSICA PROTECTION PRODUCTS LLC
2400 Boston Street
Suite 358
Baltimore, MD 21224

August 23, 2006

Caudill Seed Co., Inc.
1402 W. Main Street
Louisville, Kentucky 40203
<u>Attention:</u> Mr. Dan Caudill

Dear Dan:

I refer to the Sublicense, Manufacture and Distribution Agreement (the "Agreement"), dated of December 6, 2004, by and between Brassica Protection Products LLC ("BPP") and Caudill Seed & Warehouse Co., Inc., d/b/a Caudill Seed Co. ("CSC"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

This letter summarizes the discussions held today at the offices of Bingham McCutchen LLP concerning the Agreement. The results of these discussions are as follows:

1.　On or before September 23, 2006, CSC shall deliver to BPP written, standard operating procedures ("SOP") for the irradiation (described in paragraph 2) and handling (both pre and post irradiation) of all existing Product. A complete inventory of all existing Product produced (including the location thereof and whether radiated) will be provided to BPP with this SOP. The SOP must be approved in writing, in advance, by BPP and BPP shall have the right to audit the compliance by CSC with the SOP.

2.　Following approval of the SOP by BPP, CSC shall cause all existing Product (both Ingredient Product and Finished Product; except the parties will further discuss whether existing inventory of Vitalica and other non-branded finished capsules will be irradiated) to be irradiated at Sterigenics by the precise method outlined in the report entitled "Process Validation for Irradiation of SGS-100-POW" prepared by Kean Ashurst and transmitted to BPP on March 22, 2006. There shall be no further sales of existing Product unless irradiated. Prior to future sales of irradiated Product, CSC shall deliver to BPP a letter from Sterigenics or another recognized expert stating that FDA rules and regulations applicable to irradiation of products permit sales of irradiated Product and that the irradiated Product has been Labeled in accordance with such rules and regulations.

3.　There shall be no further sales (other than of already packed and sealed boxes) of Vitalica until new Labeling has been approved by BPP.

4.　Consistent with Section 3.4 of the Agreement (i) all third-party Labeling of Finished Product and Ingredient Product must be approved by BPP in writing prior to sale; and (ii) all Packaging used by CSC or third parties must be reviewed and approved in advance in writing by BPP.

5.     CSC shall comply with the requirements of Section 4.4 of the Agreement with respect to the use of the name of THE JOHNS HOPKINS UNIVERSITY and THE JOHNS HOPKINS HEALTH SYSTEM.  Specifically, patent numbers specified by BPP must continue to be displayed on all Labeling.  Generally, pursuant to Section 4.4 of the Agreement, all Labeling, whether or not the Johns Hopkins name is used, must be approved in advance by BPP.  BPP and CSC will review the existing templates for Labeling currently used by CSC.

6.     In accordance with Section 4.5 of the Agreement, on or before October 31, 2006, CSC will provide BPP with a Marketing Plan, which should detail the target customer and consumer, the positioning of Product to both consumer and trade, the basis for this positioning, the plan for reaching them and a review of all the proposed marketing materials. (A one-page summary of sales efforts, as has been provided in the past, is not adequate.)

If this letter correctly summarizes our discussions today, please so acknowledge by signing this letter on the line set forth below.  Nothing contained herein shall constitute an amendment to the Agreement or an admission by either party of breach or default under the Agreement, and this letter merely constitutes a clarification of existing rights and obligations of the parties under the Agreement.

BRASSICA PROTECTION PRODUCTS LLC

By: _____

Name:   ANTONY  TALALAY

Title:   CEO.

ACKNOWLEDGED AND AGREED:

CAUDILL SEED CO., INC.

By: _____

Name: S. Dan Caudill

Title: C.E.O.

Exhibit G

# BINGHAM

LEGAL INSIGHT. BUSINESS INSTINCT.

Floyd I. Wittlin
Direct Phone:  212.705.7466
Direct Fax:     212.702.3625
floyd.wittlin@bingham.com
Our File No.:  0795308/0000310006

July 11, 2007

Mr. Patrick J. Welsh
Greenebaum Doll & McDonald
3300 National City Tower
Louisville, KY  40202

Dear Pat:

We represent Brassica Protection Products LLC ("BPP").  I refer to the letter dated
June 8, 2007 from Antony Talalay, CEO of BPP, to Caudill Seed Co. (the "Letter").
Capitalized terms used but not defined herein shall have the meanings ascribed to them in
the Letter.

At your request, BPP agrees to extend the Effective Date until July 20, 2007 for the sole
purpose of giving the parties time to negotiate a new Sublicense, Manufacture and
Distribution Agreement and for no other purpose.

If, on or before July 20, 2007, BPP and CSC enter into a new Sublicense, Manufacture
and Distribution Agreement, then BPP will withdraw the Letter.  If, on or before
July 20, 2007, BPP and CSC do not enter into a new Sublicense, Manufacture and
Distribution Agreement, then the Letter shall continue in effect and the Effective Date
shall be July 21, 2007.  Except as hereby modified, the Letter remains unchanged and in
full force and effect.

Very truly yours,

Floyd I. Wittlin

FIW/sja

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689

T 212.705.7000
F 212.752.5378
bingham.com

Exhibit H

07/20/07  16:57 FAX 502 587 3695          GD&M                              ☑001/005



3500 NATIONAL CITY TOWER
101 SOUTH FIFTH STREET
LOUISVILLE, KENTUCKY 40202-3197
502/589-4200
FAX 502/587-3695
www.greenebaum.com

| To | Phone Number | Fax Number |
|---|---|---|
| Antony Talalay | (410) 732-1200 | (410) 732-1980 |
| Floyd I. Wittlin | (212) 703-3625 | (212) 702-3625 |

| From: | Patrick J. Welsh | (502) 587-3679 | (502) 540-2228 |
|---|---|---|---|

**Date:** July 20, 2007

**Subject:** Brassica – Caudill Seed

**Pages:** 5 page(s), including cover page

**Report Transmission Problems To:** Patty O'Brien (PJO)

**Message:**

Please see attached.

Sent via Facsimile and Federal Express

Confidentiality Notice:
The information contained in this facsimile message, and in any accompanying documents, constitutes confidential information which belongs to Greenebaum Doll & McDonald PLLC. This information is intended only for the use of the individual or entity named above. If you are not the intended recipient of this information, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on this information, is strictly prohibited. If you have received this facsimile message in error, please contact us immediately at one of the telephone numbers above to arrange for its return or destruction. Thank you.

LOUISVILLE, KY   LEXINGTON, KY   COVINGTON, KY   CINCINNATI, OH   NASHVILLE, TN   FRANKFORT, KY   WASHINGTON, DC   ATLANTA, GA

# CAUDILL SEED
COMPANY, INCORPORATED



502 583-4402
Fax 502 585-4374
E-mail: cao@caudillseed.com

1402 W. Main St.
Louisville, KY  40203-1328

July 20, 2007

Brassica Protection Products LLC
2400 Boston Street
Suite 358
Baltimore, Maryland  21224

Attn:   Mr. Antony Talalay

Dear Tony:

This letter is in response to yours of June 8, 2007 ("Termination Letter"), which attempts to provide notice of termination of the Sublicence, Manufacture and Distribution Agreement ("Agreement"), dated as of December 6, 2004, between Brassica Protection Products LLC ("BPP") and Caudill Seed & Warehouse Co., Inc., d/b/a Caudill Seed Co. ("CSC"), as amended by letter from BPP's counsel, Floyd I. Wittlin, dated July 11, 2007, to CSC's counsel, Patrick. Welsh.

All capitalized terms used herein and not otherwise defined herein shall have the same meanings as in the Agreement.

First and foremost, with one, immaterial exception, CSC disputes each and every allegation contained in your Termination Letter. The exception refers to CSC's failure to deliver to BPP a certificate of insurance, as provided in Section 12.4 of the Agreement. That certificate is attached to this letter, thus curing any so called "breach," although we assert that BPP has waived any related breach.

Each and every other document and other item referenced in the Termination Letter as not having been delivered to BPP has either in fact been delivered or made available to BPP or its representatives for its inspection pursuant to the terms of the Agreement. Such documentation and items include, but are not limited to, "all Records relating to the production, manufacture, packaging, labeling, storage, shipment, supplying and disposition of each Product batch"; "complete Product manufacturing batch records"; "samples of each lot or batch of Product manufactured and shipped under the Agreement"; "annual marketing plans"; "customer communications"; and Product samples

Additionally, CSC has complied in all respects with the terms of the August 23, 2006 letter referred to in the Termination Letter.

Finally, CSC is not in violation of any of its obligations with respect to Labeling of Product.

CSC's obligations with respect to Product are governed by the Agreement. Specifically, in Section 3.1 of the Agreement, "Standards," "CSC agrees to produce or cause to be produced, manufacture or cause to be manufactured, fill, test, package, label, store, ship, supply, dispose and otherwise handle the Product, and to perform its obligations hereunder, in material compliance with applicable Laws, Regulations, GMPs and in strict compliance with the Specifications." The Agreement defines "Specifications" as "specifications for the Ingredient Product and the Finished Product as set forth in Exhibit A attached hereto ...." That Exhibit was not attached to the Agreement when executed, and has never been delivered by BPP. The only document specifically addressing Specifications for Product were attached to a document entitled "Exhibit B," which again was not delivered at the time of execution of the Agreement. Moreover, Section 3.3 of the Agreement, pursuant to which Exhibit was to be delivered addresses the use of broccoli seeds, not the manufacture of the Product. As you are aware, CSC has never, including during our August meeting at your counsel's office, agreed to the provisions of Exhibit B. Nonetheless, with the exception of the subsequently irradiated Product, it has never been alleged that Product has not complied with the "Material specifications: SGS brand glucosinolate," which was attached to the proposed Exhibit B and is the only reference to specifications.

BPP bases several of its allegations on the report, dated May 31, 2007 (the "Report"), of its retained consultant, Carl C. Reynolds, of EAS Consulting Group ("Reynolds"). One need only look to Reynolds' conclusions to determine that BPP lacks sufficient basis on which to terminate the Agreement. Nowhere in those conclusions does Reynolds state that Product was not manufactured in accordance with the requirements of the Agreement. Rather, Reynolds states that he has no basis to conclude otherwise, and that with the caveat that he has not visited other manufacturing facilities. He does conclude that "SGS is not manufactured in accordance with the Product Specifications." The Report defines Product Specifications as those contained on the aforementioned Exhibit B, which never constituted a part of the Agreement. Based upon these conclusions, I will not take the time in this letter to address the other inaccuracies contained in the Report, but we are fully prepared to do so if it becomes necessary.

As we have discussed on several occasions, CSC would agree to discuss obligations with respect to compliance with 21 CFR 111 and other Regulations with respect to the manufacture of Product. Otherwise we remain committed to the performance of our obligations under the Agreement, including those related to the manufacture of the Product pursuant to Section 3.2 of the Agreement. Accordingly, we expect BPP to fulfill its corresponding obligations.

     In conclusion, CSC asserts that it has not breached the Agreement as provided in the Termination Letter, and the Termination Letter is ineffective with respect to termination of the Agreement. Additionally, BPP's attempt to terminate the Agreement constitutes a material breach thereof, entitling CSC to exercise all rights and remedies available to it, including, without limitation, termination of the Agreement, all of which rights and remedies are hereby preserved by CSC. CSC intends to defend vigorously its rights under the Agreement so as to enable it to realize the benefits of its bargain, as evidenced by CSC's investment in BPP, the fees paid to BPP pursuant to the Agreement, and CSC's enormous investment in the development, manufacture and marketing of the Product.

Very truly yours,

Caudill Seed Co.

By:

Dan Caudill
President

cc:    Bingham McCutchen LLC
      399 Park Avenue
      New York, NY 10022
      Attn: Floyd I. Wittlin, Esq.
      (via Facsimile and Federal Express)

07/20/07  16:58 FAX 502 587 3695        GD&M                                    @005/005

Jul·17· 2007  3:50PM   Sypris Tube Turns Div                      No.0632  P. 3/3

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
07/17/2007

| PRODUCER (615)292-2286    FAX (615)292-2911 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| Arthur J. Gallagher & Co. of Tennessee. Inc. 3322 West End Ave. Suite 500 Nashville. TN 37203 | |

| | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED Caudill Seed & Warehouse Co., Inc. DBA: Caudill Seed Company 1402 West Main St. Louisville, KY 40203 | INSURER A: Michigan Millers Mutual Ins Co | |
| | INSURER B: Technology Insurance Co. | |
| | INSURER C: Federal Insurance Co. | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADDL INSR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | GENERAL LIABILITY [X] COMMERCIAL GENERAL LIABILITY CLAIMS MADE [X] OCCUR | A0105095 | 08/15/2006 | 08/15/2007 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: [X] POLICY [ ] PRO-JECT [ ] LOC | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | | AUTOMOBILE LIABILITY [X] ANY AUTO [ ] ALL OWNED AUTOS [ ] SCHEDULED AUTOS [ ] HIRED AUTOS [ ] NON-OWNED AUTOS | A0105095 | 08/15/2006 | 08/15/2007 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY [ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC AUTO ONLY: AGG | $ |
| C | | EXCESS/UMBRELLA LIABILITY [X] OCCUR [ ] CLAIMS MADE [ ] DEDUCTIBLE [ ] RETENTION $ | 79826330 | 08/15/2006 | 08/15/2007 | EACH OCCURRENCE | $ 9,000,000 |
| | | | | | | AGGREGATE | $ 9,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| B | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | TWC3113286 | 08/15/2006 | 08/15/2007 | [X] WC STATU-TORY LIMITS | OTH-ER |
| | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| | | OTHER | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
Brassica Protection Products is named as additional insured-vendor as respects General Liability coverage as evidenced herein, as required by written contract.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Brassica Protection Products 2400 Boston St. Suite 358 Baltimore, MD 21224 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| | AUTHORIZED REPRESENTATIVE Don Mayes/MSHILL    _Don L. Mayes_ |

ACORD 25 (2001/08)  FAX: (410)732-1980                                    ©ACORD CORPORATION 1988

Exhibit
I





**Welcome to YourSGS.com.** For decades, it has been widely accepted that a diet rich in fruits and vegetables is vital for good health. One important component of this diet can be broccoli, confirmed when Johns Hopkins University School of Medicine identified its high concentration of **sgs™** glucosinolate, a natural occurring antioxidant.

In its precursor form, sulforaphane glucosinolate or **sgs™** functions as an indirect antioxidant. Indirect antioxidants have long-lasting effects, triggering broad-spectrum free radical elimination that may last for days. Direct antioxidants, such as Vitamin E and beta-carotene, neutralize only one molecule of a free radical at a time, and are destroyed in the process.

Overview

How it Works

The Benefits

Talk to your doctor about the benefits c



Our online store is
**NOW OPEN!**
Click Here To Visit

The same scientists at Johns Hopkins University School of Medicine, who made the discovery, believe that **sgs™** contributes to the integrity of cells, boosting the body's immune defense systems for overall health and well-being. Since this discovery, more than 200 publications from universities worldwide have underscored its significance. Due to fluctuations of this active ingredient throughout broccoli species, **C S Agra**, employing traditional breeding methods, worked with scientists at Johns Hopkins University School of Medicine to develop varieties of broccoli seed containing up to 300% higher levels of **sgs™** glucosinolate, and patented its extraction methodology.

From this foundation, **C S Agra** introduces **Vitalica**, the daily **sgs™** dietary supplement that promotes detoxification, acts as an antioxidant, and enhances cellular integrity. Each **Vitalica** capsule delivers a full 30 mg of **sgs™**, the first line of the body's cellular defenses. Few supplements are available with the scientific pedigree that **"Vitalica, the accent on wellness"** carries with it. Further, the sgs™ ingredient will be made available to other products, such as **Brassica® Teas**. It is also expected that the success of **Vitalica** will cause others to mimic its content or to introduce products to ride on its coattails. REMEMBER, if you do not see **sgs™** on a product's label, then you are not receiving the complete **sgs™** benefits.

C S Agra

CALL

866-747-0990

1402 West Main Street , Louisville, Kentucky  40203
E-mail: sales@yoursgs.com

©2005

These statements have not been evaluated by the Food and Drug Administration.
This product is not intended to diagnose, treat, cure or prevent any disease.